**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Richmond Division

| | | |
|---|---|---|
| **THE HILB GROUP OF** | ) | |
| **NEW ENGLAND, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 3:24cv00462** |
| **v.** | ) | |
| | ) | |
| **CHRISTOPHER LAVORGNA,** | ) | |
| **ERIC LAVORGNA &** | ) | |
| **PRECISION INSURANCE LLC** | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS**
**MOTION FOR A TEMPORARY RESTRAINING ORDER**
**OR, IN THE ALTERNATIVE, A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................. 2

ARGUMENT ..................................................................................................................... 4

I.      Legal Standard ......................................................................................................... 4

II.     THG-NE Is Likely To Succeed On The Merits Of Its Claims ................................ 5

       A.     THG-NE Will Prove Christopher Breached The RCA ................................. 5

            1.     Delaware Law Governs the RCA .................................................... 5

            2.     Christopher Violated the Valid and Enforceable RCA .................... 6

       B.     THG-NE Will Prove Christopher Misappropriated Trade Secrets ............... 10

            1.     Delaware Law Governs THG-NE's Trade Secret Claim ................. 10

            2.     The Information Christopher Took Constitutes Trade Secrets ......... 11

            3.     Christopher Misappropriated THG-NE's Trade Secrets .................. 13

III.    THG-NE Will Suffer Irreparable Harm Absent Injunctive Relief .......................... 14

IV.    The Balance Of Equities Weighs In THG-NE's Favor ........................................... 17

V.     Injunctive Relief Serves The Public Interest ......................................................... 19

CONCLUSION .................................................................................................................. 20

Page(s)

**Federal Cases**

*A.P. Moller-Maersk A/S v. Escrub Sys., Inc.*,
  2007 WL 4562827 (E.D. Va. Dec. 21, 2007) ..........................................................................19

*API Tech. Servs., LLC v. Francis*,
  2013 WL 12131381 (E.D. Va. Dec. 4, 2013) ..........................................................................19

*Atl. Diving Supply, Inc. v. Moses*,
  2014 WL 3783343 (E.D. Va. July 31, 2014) ............................................................................6

*Centennial Broad, LLC v. Burns*,
  2006 WL 2850640 (W.D. Va. Sept. 29, 2006) .......................................................................20

*Colgan Air, Inc. v. Raytheon Aircraft Co.*,
  507 F.3d 270 (4th Cir. 2007) ...................................................................................................5

*Fid. Glob. Brokerage Grp., Inc. v. Gray*,
  2010 WL 4646039 (E.D. Va. Nov. 9, 2010).....................................................................15, 18

*Francis v. Allstate Ins. Co.*,
  709 F.3d 362 (4th Cir. 2013) ...................................................................................................5

*Hanna v. Plumer*,
  380 U.S. 460 (1965)................................................................................................................14

*Hilb Grp. of Maryland, LLC v. Smith*,
  2024 WL 2216851 (M.D. Pa. May 15, 2024) .........................................................................17

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*,
  174 F.3d 411 (4th Cir. 1999) ...................................................................................................4

*JTH Tax, Inc. v. Olivo*,
  2016 WL 595297 (E.D. Va. Feb. 12, 2016)............................................................................19

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*,
  756 F.2d 1048 (4th Cir. 1985) ...............................................................................................15

*Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*,
  22 F.3d 546 (4th Cir. 1994) ..............................................................................................14, 15

*Nat'l Homes Corp. v. Lester Indus., Inc.*,
  293 F. Supp. 1025 (W.D. Va. 1968) .......................................................................................20

*Noble Supply & Logistics, LLC v. Curry*,
  2023 WL 8481021 (W.D. Va. Dec. 7, 2023) ........................................................ 17

*O'Sullivan Films, Inc. v. Neaves*,
  352 F. Supp. 3d 617 (W.D. Va. 2018) ............................................................ 17, 19

*Oakwood Lab'ys LLC v. Thanoo*,
  999 F.3d 892 (3d Cir. 2021) .............................................................................. 13

*Precision Pipeline, LLC v. Dominion Transmission, Inc.*,
  2017 WL 1100903 (E.D. Va. Mar. 23, 2017) ..................................................... 11

*Pyott-Boone Elecs. Inc. v. IRR Tr. for Donald L. Fetterolf Dated Dec. 9, 1997*,
  918 F. Supp. 2d 532 (W.D. Va. 2013) ............................................................... 10

*Sensus USA, Inc. v. Franklin*,
  2016 WL 1466488 (D. Del. Apr. 14, 2016) ....................................................... 20

*TechINT Sols. Grp., LLC v. Sassnett*,
  2018 WL 4655752 (W.D. Va. Sept. 27, 2018) ................................................... 19

*TP Group-CI, Inc. v. Vetecnick*,
  2016 WL 5864030 (D. Del. Oct. 6, 2016) ............................................... 17, 18, 19

*Update, Inc. v. Samilow*,
  311 F. Supp. 3d 784 (E.D. Va. 2018) ..................................................... 15, 16, 17, 19

*Variable Annuity Life Ins. Co. v. Coreth*,
  535 F. Supp. 3d 488 (E.D. Va. 2021) ........................................ 5, 14, 15, 16, 18, 19, 20

*Williams v. Progressive Direct Ins. Co.*,
  631 F. Supp. 3d 202 (D. Del. 2022) ..................................................................... 6

*XL Specialty Ins. Co. v. Truland*,
  2015 WL 925582 (E.D. Va. Mar. 3, 2015) ......................................................... 10

**State Cases**

*Agilent Techs., Inc. v. Kirkland*,
  2010 WL 610725 (Del. Ch. Feb. 18, 2010) ..................................................... 6, 13

*Am. Totalisator Co. v. Autotote Ltd.*,
  1983 WL 21374 (Del. Ch. Aug. 18, 1983) ......................................................... 12

*Cantor Fitzgerald, L.P. v. Ainslie*,
  312 A.3d 674 (Del. 2024) ..................................................................................... 7

*Cirrus Holding Co. v. Cirrus Indus., Inc.*,
  794 A.2d 1191 (Del. Ch. 2001) ........................................................................... 9

*In re Digex, Inc. S'holders Litig.*,
    789 A.2d 1176 (Del. Ch. 2000)..................................................................................17

*Eastman Kodak Co. v. Cetus Corp.*,
    1991 WL 255936 (Del. Ch. Dec. 3, 1991) ...............................................................15

*Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC*,
    2010 WL 338219 (Del. Ch. Jan. 29, 2010).......................................6, 12, 13, 14

*Hooper v. Musolino*,
    364 S.E.2d 207 (Va. 1988)......................................................................................5

*Hough Assocs., Inc. v. Hill*,
    2007 WL 148751 (Del. Ch. Jan. 17, 2007)...........................................................18

*Kan-Di-Ki, LLC v. Suer*,
    2015 WL 4503210 (Del. Ch. July 22, 2015)............................................................8

*Mountain W. Series of Lockton Cos., LLC v. Alliant Ins. Servs., Inc.*,
    2019 WL 2536104 (Del. Ch. June 20, 2019)........................................................15

*Nucar Consulting, Inc. v. Doyle*,
    2005 WL 820706 (Del. Ch. Apr. 5, 2005), *aff'd*, 913 A.2d 569 (Del. 2006) ...................12, 14

*Rsch. & Trading Corp. v. Pfuhl*,
    1992 WL 345465 (Del. Ch. Nov. 18, 1992) .......................................................8, 9

*Singh v. Batta Env't Assocs., Inc.*,
    2003 WL 21309115 (Del. Ch. May 21, 2003).........................................................7

*Tristate Courier & Carriage, Inc. v. Berryman*,
    2004 WL 835886 (Del. Ch. Apr. 15, 2004).............................................................8

*Triton Const. Co. v. E. Shore Elec. Servs., Inc.*,
    2009 WL 1387115 (Del. Ch. May 18, 2009)...........................................................7

*Ulloa v. QSP, Inc.*,
    624 S.E.2d 43 (Va. 2006).......................................................................................17

**Federal Statutes**

18 U.S.C. § 1836..................................................................................................................10

18 U.S.C. § 1839(3).............................................................................................................11

18 U.S.C. § 1839(5).............................................................................................................13

18 U.S.C. § 1839(6).............................................................................................................13

**State Statutes**

Conn. Gen. Stat. Ann. § 35-50 *et seq.* ......................................................................11

Del. Code Ann. Title 6, § 2001(1)-(2) ......................................................................13

Del. Code Ann. Title 6, § 2001(4) ..........................................................................11

Del. Code Ann. Title 6, § 2001 *et seq.* ...................................................................10

Del. Uniform Trade Secrets Act ..........................................................................5, 10

Va. Code Ann. § 59.1-336 *et seq.* ..........................................................................11

The Hilb Group of New England, LLC ("THG-NE"), by counsel and pursuant to Fed. R. Civ. P. 65, submits as follows in support of its request for immediate injunctive relief.

<h2 style="text-align:center;"><u>INTRODUCTION</u></h2>

Christopher LaVorgna ("Christopher")[1] worked as an insurance broker for THG-NE, specializing in employee benefits, until he resigned on April 30, 2024, to start his own competing brokerage with his brother. As a condition of his employment, Christopher had signed a restrictive covenant agreement (the "RCA") promising he would not solicit or work with his THG-NE customers for two years after leaving THG-NE. Yet, within days of Christopher's departure, THG-NE began losing clients to his new brokerage, Precision Insurance, LLC. In just a few weeks, THG-NE has lost eight clients (all of whom worked with Christopher) and fears more will soon follow. What's more, when THG-NE began to investigate, it learned that over the last several months of his employment, Christopher had been surreptitiously stealing all the information he would need to seamlessly convert these clients by e-mailing himself confidential and trade secret information. Now, Christopher, his brother Eric (who also owes THG-NE certain confidentiality obligations), and Precision are using that information to flout Christopher's non-solicit obligations and destroy THG-NE's customer relationships and goodwill.

Despite THG-NE's best efforts to get Christopher to comply with his contractual and common law obligations, he continues to unlawfully retain THG-NE information and to actively undermine THG-NE with its customers. THG-NE therefore seeks an immediate injunction to ensure the safe return of its information and prevent further irreparable harm to its business.

---

[1]    Because Christopher and his brother share the LaVorgna surname and are both relevant to this narrative, THG-NE uses their first names for the Court's ease of reference.

## **FACTUAL BACKGROUND**

Insurance is a highly competitive industry.  (Verified Complaint, ECF No. 1 ("VC") ¶ 22.)[2] To succeed in that industry, THG-NE depends on (1) building strong customer relationships and goodwill, and (2) safeguarding its trade secrets.  (VC ¶¶ 23-24.)  THG-NE protects its trade secrets by (among other things) limiting access to sensitive data; implementing comprehensive employee policies; and requiring employees to sign confidentiality agreements.  (*See* VC ¶¶ 25, 42.)

Christopher was one such employee.  (VC ¶ 43.)  As a THG-NE broker, Christopher interacted with THG-NE customers, and accessed confidential information about those customers and their insurance carriers on a daily basis.  (VC ¶¶ 29, 34.)  Christopher focused primarily on employee benefits and related consulting services, which meant he also frequently accessed and used highly sensitive information about customers' employees and their insurance benefit elections.  (VC ¶¶ 29, 34.)  In exchange for employment with THG-NE, Christopher signed a Restrictive Covenant Agreement (the "RCA," VC Ex. A at 7) in which he promised not to disclose THG-NE's confidential information; to return that information upon his departure; and to refrain from soliciting or selling insurance to the THG-NE customers with whom he had worked for two years after leaving the Company.  (RCA ¶¶ 2-3.)

Less than a month after abruptly announcing his resignation, Christopher has broken—and continues to break—all of those promises.  Over the last year of his employment, Christopher strategically collected and stole all of the confidential information about his THG-NE clients he would need to seamlessly transition them to competitors.  He even brazenly took the time to organize the information into client-specific "packets."  (VC ¶¶ 62-67.)  This client information included:  renewal negotiation proposals; customer insurance policies; customers' employees'

---

[2]    A more fulsome factual recitation appears in the Verified Complaint.  In the interests of space, THG-NE briefly repeats the most salient facts here.

benefit elections; comprehensive summaries of customers' employee benefits policies; and detailed carrier pricing, including "rate grids" reflecting the prices charged by the carrier for each employee benefit plan offered to a particular customer based on employee demographics. (VC ¶ 63.) Christopher then secretly and without authorization e-mailed those packets to his personal e-mail account.

At the same time, Christopher also began plotting with his brother, Eric LaVorgna ("Eric"), to form a competing brokerage and circumvent his contractual obligations. (VC ¶ 68.) In accordance with this plan, Eric registered Precision Insurance, LLC on March 14, 2024. (VC ¶ 69.) On April 30, 2024, Christopher resigned from THG-NE to join his brother at Precision. (VC ¶¶ 70-74.) Within two weeks of his resignation, five of Christopher's clients (including some about whom he had stolen THG-NE information) had left THG-NE for Precision. (VC ¶¶ 75-76, 81.)

THG-NE promptly sent Christopher, along with Eric and Precision, a cease-and-desist letter, demanding that he (1) stop violating his RCA; (2) preserve and return all THG-NE Confidential Information (as defined in the RCA); (3) identify all Confidential Information he had shared with any third parties; (4) identify all Customers and Active Prospective Customers (as defined in the RCA) with whom he had communicated regarding insurance products or services since leaving THG-NE; and (5) inform all Customers with whom he was working that he could not provide any insurance products or services to them for the duration of his two-year non-solicit period. (VC ¶¶ 77-78.) Christopher, Eric, and Precision all ignored THG-NE's letters, and continued in their unlawful conduct. (VC ¶ 79.) After discovering Christopher's theft of its valuable information, THG-NE sent a second round of cease-and-desist letters emphasizing Christopher's misappropriation of trade secrets. Christopher provided none of the requested

information, and (despite the overwhelming evidence to the contrary) claimed that he "ha[d] not" and did not "intend to violate any of [his] contractual agreements." (VC ¶ 83.) Even after THG-NE reiterated its demands, Christopher refused to admit his theft of (or return any) confidential information; declined to explain the wave of customer departures; denied all wrongdoing; and refused to preserve, segregate, and provide the THG-NE information and property he took and continues to possess. (VC ¶ 84.) Instead, Christopher, Eric, and Precision continued in their unlawful conduct, soliciting and targeting THG-NE customers. In fact, just days after receiving THG-NE's second letter, Eric escalated Precision's misconduct by defaming THG-NE to a current customer, deriding THG-NE's "botched renewals, extremely slow response times (if the answers are even correct altogether), and a genuine lack of intimacy between broker and business client." (VC ¶¶ 85-98.) To date, neither Eric nor Precision has so much has acknowledged THG-NE's letters, and all three defendants continue to work together to undermine THG-NE's reputation in the marketplace.

In sum, Christopher's actions to date leave no doubt: nothing short of injunctive relief will protect THG-NE's trade secrets and vital customer goodwill.

## ARGUMENT

### I. Legal Standard

The purposes of a temporary restraining order are to preserve the status quo and prevent irreparable harm until the Court can hold a preliminary injunction hearing. *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 422 (4th Cir. 1999). Under the Federal Rules of Civil Procedure, a court may issue a TRO without notice if "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition" and "the movant's attorney certifies

in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b)(1).

A party seeking a TRO must show the same four factors necessary for issuance of a preliminary injunction, namely: (1) a likelihood of success on the merits; (2) a threat of irreparable harm; (3) that the harm to the movant outweighs the harm to the non-moving party; and (4) that the injunction would not adversely affect the public interest. *E.g.*, *Variable Annuity Life Ins. Co. v. Coreth*, 535 F. Supp. 3d 488, 501 (E.D. Va. 2021). THG-NE readily satisfies each of these factors.

## II.  <u>THG-NE Is Likely To Succeed On The Merits Of Its Claims</u>

Based on its investigation to date, THG-NE has sufficient evidence to prove that (1) Christopher has breached his contractual confidentiality and non-solicitation obligations to THG-NE; and (2) Christopher has willfully misappropriated THG-NE's trade secrets under the Defend Trade Secrets Act ("DTSA") and the Delaware Uniform Trade Secrets Act ("DUTSA").

### A.  **THG-NE Will Prove Christopher Breached The RCA**

#### 1.  **Delaware Law Governs the RCA**

Because the Court is sitting in diversity, it looks to the choice-of-law rules of Virginia. *Francis v. Allstate Ins. Co.*, 709 F.3d 362, 369 (4th Cir. 2013). "Virginia law looks favorably upon choice of law clauses in a contract, giving them full effect," *Colgan Air, Inc. v. Raytheon Aircraft Co.,* 507 F.3d 270, 275 (4th Cir. 2007), if the selected "state is reasonably related to the purpose of the agreement," *Hooper v. Musolino,* 364 S.E.2d 207, 211 (Va. 1988).

Here, the parties to the RCA elected that it would be "interpreted and enforced in accordance with the laws of the State of Delaware without regard to any conflicts of law provisions of principles [sic] thereof to the contrary." (RCA ¶ 14.) Additionally, THG-NE is organized under the laws of Delaware. (VC ¶ 3.) As such, the choice of law provision is "reasonably related to the

purpose of the agreement," and Delaware substantive law governs. *See, e.g., Atl. Diving Supply, Inc. v. Moses*, 2014 WL 3783343, at *6 (E.D. Va. July 31, 2014) (granting temporary restraining order to enforce restrictive covenant agreement and applying Virginia choice-of-law rules to select Fourth Circuit procedural law and Delaware substantive law, in accordance with parties' choice of law clause, where plaintiff was incorporated in Delaware).

### 2. Christopher Violated the Valid and Enforceable RCA

THG-NE will succeed on its breach of contract claims because the RCA is enforceable under Delaware law and Christopher has violated his confidentiality and non-solicitation obligations, causing damage to THG-NE. *E.g., Williams v. Progressive Direct Ins. Co.*, 631 F. Supp. 3d 202, 213 (D. Del. 2022) (observing that a breach of contract plaintiff in Delaware must establish (1) existence of a contract, (2) breach, and (3) damages).

First, the RCA prohibits Christopher from removing Confidential Information from THG-NE premises and requires him to return all such materials to THG-NE upon his termination. (RCA ¶ 2.G.) Christopher also agreed to keep THG-NE's confidential information secret and not use or disclose it after leaving the company. (*Id.* ¶ 2.C.) Delaware courts routinely enforce such obligations. *E.g., Agilent Techs., Inc. v. Kirkland*, 2010 WL 610725, at *14 (Del. Ch. Feb. 18, 2010) (granting permanent injunction where employees breached confidentiality provisions by failing to return confidential information in violation of return-of-property provision, despite reminder of contractual obligations); *Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC*, 2010 WL 338219, at *14 (Del. Ch. Jan. 29, 2010) (granting permanent injunction against defendant that encouraged employees to retain plaintiff's confidential customer information in violation of return-of-property provision). Indeed, even in the absence of an express contract, Delaware law prohibits an employee from using an employer's property or confidential information for the employee's "own purposes or those of a third party," both during and after

6

employment.  *Triton Const. Co. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *15 (Del. Ch. May 18, 2009), *aff'd,* 988 A.2d 938 (Del. 2010).

Christopher cannot dispute he has breached these obligations by emailing himself confidential customer information for the purpose of unlawfully competing against THG-NE.  As noted above, the information Christopher emailed himself included carrier pricing and renewal information; customer insurance policies; detailed benefits summaries; and documents detailing customers' employees' individual benefit elections.  (VC ¶ 60.)  The RCA expressly includes such items in the definition of "Confidential Information."  (RCA ¶ 2.A. (defining "Confidential Information" to include "customer pricing, rates, customer lists" "policies," and "compilations of information").)  And, by refusing to return (or even acknowledge having taken) this information upon his separation, Christopher has breached the RCA.

Christopher has also breached his non-solicitation covenants, which prohibit him from soliciting his THG-NE customers, helping others do so, and selling insurance-related products or services to those customers for two years after leaving THG-NE.  (RCA ¶ 3.)  Delaware courts will enforce such covenants in the employment context if they are (1) reasonable in geographic scope and temporal duration, (2) advance legitimate economic interests of the party seeking enforcement, and (3) survive a balancing of the equities.  *E.g.*, *Cantor Fitzgerald, L.P. v. Ainslie*, 312 A.3d 674, 684 n.65 (Del. 2024).  Here, THG-NE readily satisfies all three requirements.

First, the non-solicitation covenant is reasonable in duration and scope.  Delaware courts routinely enforce non-competition periods equal to or longer than the RCA's two-year non-solicit, so the RCA's duration is reasonable.  *E.g.*, *Singh v. Batta Env't Assocs., Inc.*, 2003 WL 21309115, at *7 (Del. Ch. May 21, 2003).  So too is its scope.  Delaware courts recognize that non-solicitation agreements "inherently establish a geographic limit that ultimately protects the legitimate

economic interests of the employer" and need not contain an express territorial scope to be enforceable. *Tristate Courier & Carriage, Inc. v. Berryman*, 2004 WL 835886, at *11 (Del. Ch. Apr. 15, 2004) (citation omitted). And non-solicitation provisions that prohibit an employee from interfering with the customer relationships his former employer paid him to build are consistently enforced under Delaware law. *E.g.*, *Berryman*, 2004 WL 835886, at *15 (granting permanent injunction to prohibit defendant from soliciting or assisting in soliciting any customer of his former employer). Thus, the RCA's non-solicitation covenants are enforceable.

Second, the RCA protects the legitimate interests of THG-NE. It is well-established in Delaware that an employer has a right to use a restrictive covenant to protects its "interest in the goodwill created by its sales representatives and other employees, which is vulnerable to misappropriation if the employer's former employees are allowed to solicit its customers shortly after changing jobs." *Rsch. & Trading Corp. v. Pfuhl*, 1992 WL 345465, at *12 (Del. Ch. Nov. 18, 1992). So, too, is an employer's right to apply restrictive covenants to safeguard against misuse of its confidential information. *E.g.*, *Kan-Di-Ki, LLC v. Suer*, 2015 WL 4503210, at *20 (Del. Ch. July 22, 2015) ("'Legitimate interests' recognized by Delaware law include protection of employer goodwill, and protection of employer confidential information from misuse."). Both interests are crucial here. Christopher's primary responsibility was building and maintaining THG-NE's customer relationships. (VC ¶ 29.) And, in doing so, Christopher routinely accessed and used highly confidential and trade secret information on THG-NE's behalf, including customer contact information; policy terms; carrier pricing; customers' employee benefit elections; and similar information. (VC ¶ 29.)

Third, as discussed in full *infra*, the balance of equities weighs in favor of enforcing the RCA. "This analysis involves balancing the interests sought to be protected by plaintiff . . . against

the injury that injunctive relief would cause to the individual defendants." *Pfuhl*, 1992 WL 345465, at *13. Delaware courts have acknowledged that an employer's interest in protecting customer relationships is "weighty and worthy of the court's protection." *Id.* In contrast, when the requested injunctive relief is the narrow enforcement of a reasonable restrictive covenant agreement, the harm of enforcement "is far from grave." *Id.* Such is the case here, where THG-NE merely seeks to protect its customer goodwill and confidential information, and enforcement of the agreement "would not bar [Christopher] from the industry." *See id.*

To avoid any doubt, Christopher specifically and contractually agreed that the covenants within the RCA were reasonable and advance THG-NE's legitimate interest.[3] As such, Christopher should not be heard to dispute that the RCA is enforceable. *See Cirrus Holding Co. v. Cirrus Indus., Inc.*, 794 A.2d 1191, 1209 (Del. Ch. 2001) (holding contractual stipulations dispositive for purposes of preliminary injunction).

Finally, Christopher cannot genuinely dispute he has breached his restrictive covenants, directly and/or indirectly with the help of Eric and Precision. Within days of Christopher's departure to start his own competing brokerage, five customers with whom Christopher had worked left THG-NE and moved to Precision, including one customer about whom Christopher had just stolen confidential information. (VC ¶¶ 62-76.) Despite this clear evidence of wrongdoing, when confronted, Christopher continued to pretend he had no involvement in the

---

[3] The RCA provides: "Employee acknowledges that the restrictions stated herein are reasonable and necessary to protect the legitimate business interests of the Company and THG and do not unduly impede or interfere with Employee's ability to earn a livelihood. Employee further acknowledges that the Company and THG are presenting this Agreement for execution in good faith as necessary to protect their legitimate business interests." (RCA ¶ 7.)

customers' departure and, instead, sought to hide behind Eric's and Precision's actions. (VC ¶¶ 82-84.)

In short, not only has Christopher already breached his RCA, but his actions reflect every intention to keep doing so absent court intervention. THG-NE has therefore shown a likelihood of success on its breach of contract claims.

### B.     THG-NE Will Prove Christopher Misappropriated Trade Secrets

Based on its investigation to date, THG-NE has obtained more than enough evidence to prove that Christopher willfully misappropriated THG-NE's trade secrets under the Defend Trade Secrets Act ("DTSA") and the Delaware Uniform Trade Secrets Act ("DUTSA"). To prevail on those claims, THG-NE will establish that (1) it owned "trade secrets," and (2) Christopher misappropriated those trade secrets. 18 U.S.C. § 1836; Del. Code Ann. tit. 6, § 2001 *et seq.*

### 1.     Delaware Law Governs THG-NE's Trade Secret Claim

Delaware law applies to THG-NE's state misappropriation of trade secrets claim because the claim arises from and relates to Christopher's Producer Employment Agreement and RCA. Like the RCA, which is an attachment to the employment agreement, the Producer Employment Agreement elects Delaware law for its interpretation and enforcement "without regard to any conflicts of law provisions or principles to the contrary." (Producer Employment Agreement ¶ 11, VC Ex. A; *see also* RCA ¶ 14.) Virginia courts uphold choice of law provisions such as these and hold that "absent a showing of intent otherwise, [the provision] be read to encompass all disputes that arise from or are related to an agreement," including tort and statutory claims. *Pyott-Boone Elecs. Inc. v. IRR Tr. for Donald L. Fetterolf Dated Dec. 9, 1997*, 918 F. Supp. 2d 532, 545 (W.D. Va. 2013) ("If parties wish to exclude causes of action arising in tort or by statute from the coverage of their agreement, they may do so, but they should reflect that intent in their contract."); *see also XL Specialty Ins. Co. v. Truland*, 2015 WL 925582, at *2 (E.D. Va. Mar. 3, 2015) ("Since

the tort claims are related to the contract [which is governed by Virginia law], Virginia law will govern the interpretation of the tort claims."); *Precision Pipeline, LLC v. Dominion Transmission, Inc.*, 2017 WL 1100903, at *3 (E.D. Va. Mar. 23, 2017) (similarly applying contract's choice of law provision to related tort claim).

Here, the misappropriation tort claims arise from and relate to the employment agreement and RCA, because, as discussed below, Christopher misappropriated THG-NE's trade secrets in the course of his employment under the agreements and in violation of them. Indeed, the RCA supplies the duty to keep THG-NE's information confidential, which is a critical component of THG-NE's misappropriation claim. Therefore, Delaware law applies to THG-NE's trade secret claim.[4]

### 2.     The Information Christopher Took Constitutes Trade Secrets

First, Christopher took information that applicable law protects as trade secrets. Under the DTSA, a "trade secret" is any "financial, business, scientific, technical, economic, or engineering information," provided that (1) "the owner thereof has taken reasonable measures to keep such information secret;" and (2) "the information derives independent economic value, actual or potential," from its secrecy. 18 U.S.C. § 1839(3). The DUTSA uses a materially similar definition. *See* Del. Code Ann. tit. 6, § 2001(4).

As set forth in the Verified Complaint, Christopher surreptitiously copied, took, and continues to possess without authorization large amounts of highly confidential THG-NE files. The stolen files include current and proposed customer renewal premium information; rate proposals and quotes; "rate grids" showing carrier pricing offers for various health plans; detailed

---

[4] Even if the Court were to determine Connecticut or Virginia law applied, however, the result is the same. All three states have adopted similar versions of the Uniform Trade Secrets Act and follow similar analyses. *See* Va. Code Ann. § 59.1-336 *et seq.*; Conn. Gen. Stat. Ann. § 35-50 *et seq.*

information about customers' employee benefit plans; customer policies; customers' employees' benefit election information; and customers' detailed financial information regarding plan funding and claims data. (VC ¶ 63.) Christopher gathered this information into customer-specific packages before emailing it to his personal email, so that he could readily and efficiently compete with THG-NE to steal these customers' business. (VC ¶¶ 62-67.) These packages contain everything a competitor would need to destroy THG-NE's relationships with these customers and overtake THG-NE in the marketplace. (VC ¶ 67.) None of this information is available to the public, and THG-NE's competitors could not normally ascertain it through legitimate means. (*E.g.*, VC ¶¶ 24-25, 38-43.)

In sum, Christopher stole the keys to THG-NE's employee benefits business. This is exactly the sort of information for which trade secret protection was created. *E.g.*, *Am. Totalisator Co. v. Autotote Ltd.*, 1983 WL 21374, at *2-5 (Del. Ch. Aug. 18, 1983) (finding that contract proposals, bidding plans, projected costs and profits on contract renewals, financial reports constituted trade secrets); *Cherrydale Fundraising*, 2010 WL 338219, at *19 (confirming that customer account information and customer lists were trade secrets); *Nucar Consulting, Inc. v. Doyle*, 2005 WL 820706, at *9 (Del. Ch. Apr. 5, 2005), *aff'd,* 913 A.2d 569 (Del. 2006) (form contracts between a company and its clients that were private, not generally known, and held independent economic value constituted trade secrets).

THG-NE also took reasonable measures to keep its information secret. THG-NE requires employees who use confidential information, like Christopher, to sign confidentiality agreements. (VC ¶¶ 42-43.) THG-NE maintains policies instructing all employees about the importance of keeping confidential information secret and returning it upon termination. (*E.g.*, VC ¶¶ 45-47.) THG-NE limits access to confidential information to those with a need to know, password-protects

its electronic systems, and requires employees to use assigned email addresses that it maintains the ability to monitor for improper dissemination of confidential information. (VC ¶ 42.)

These measures easily carry THG-NE's burden to show it took "reasonable" measures to keep its information confidential. *See Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 896 (3d Cir. 2021) (plaintiff adequately alleged reasonable measures where employer alleged it password protected electronically stored information, reasonably controlled access to such information, used NDAs, and advised employees that such information must be held confidential); *Cherrydale Fundraising*, 2010 WL 338219, at *19 (finding that password protection and confidentiality provisions in employment contract, handbook, and reminders in post-employment letters were reasonable secrecy measures); *Kirkland*, 2010 WL 610725, at *3 (finding that confidentiality agreements, restricted access to confidential documents and maintaining secure facilities constituted commercially reasonable secrecy measures). Therefore, THG-NE can establish that the information Christopher took constitutes trade secrets.

### 3. Christopher Misappropriated THG-NE's Trade Secrets

Christopher's conduct is textbook misappropriation. Under the DTSA, a party "misappropriates" a trade secret if it acquires, uses, or discloses another's trade secret through "improper means." 18 U.S.C. § 1839(5). "Improper means," in turn, include "breach or inducement of a breach of a duty to maintain secrecy[.]" 18 U.S.C. § 1839(6). Here again, Delaware law tracks the DTSA. Del. Code Ann. tit. 6, § 2001(1)-(2).

As discussed above, under the RCA, Christopher had expressly promised THG-NE that (1) he would not "use any Confidential Information . . . or disclose any Confidential Information to any person or entity other than the Company" unless and until the information became public; (2) he would not remove Confidential Information "from the premises of the Company or retain without prior written consent," and (3) he would return all Confidential Information upon his

separation.  (RCA ¶ 2.)  Christopher breached all of these obligations by stealing THG-NE trade secret information and using that information to compete against THG-NE.

Thus, Christopher acquired THG-NE's trade secrets by improper means.  *E.g.*, *Cherrydale Fundraising*, 2010 WL 338219, at *2-3, *6 (finding misappropriation based on employee forwarding customer account information and contacts to his personal email account and use of plaintiff's internal financial information to solicit employees for benefit of competitor in breach of employment agreement); *Doyle*, 2005 WL 820706, at *10-11 (finding misappropriation through retention of customer list in violation of agreement and circumstantial evidence of its use in that customer on list subsequently transferred business to competitor).  THG-NE has therefore shown a likelihood of success on its trade secret misappropriation claims.

## III.     THG-NE Will Suffer Irreparable Harm Absent Injunctive Relief

THG-NE has already suffered four types of irreparable injury, which will continue absent an immediate injunction:  (1) the unauthorized disclosure and use of its confidential and trade secret information; (2) loss of confidentiality of clients' records and financial dealings; (3) loss of customers to Precision; and (4) loss of confidence and trust of clients, loss of goodwill, and loss of business reputation.  Generally, irreparable harm "is suffered when monetary damages are difficult to ascertain or are inadequate."  *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994), *abrogated on other grounds by Winter*, 555 U.S. at 7.[5]

---

[5]     Having concluded its merits analysis under the Delaware law, THG-NE proceeds in its analysis under Fourth Circuit precedent because, sitting in diversity, "federal courts are to apply . . . federal 'procedural' law."  *Hanna v. Plumer*, 380 U.S. 460, 471 (1965); *see also Coreth*, 535 F. Supp. 3d at 512 (applying Texas law to breach of restrictive covenant claim based on choice of law clause but Fourth Circuit precedent to remainder of preliminary injunction analysis).  Of course, that procedure often looks to the law of the forum state.  *See, e.g.*, *Coreth*, 535 F. Supp. 3d at 517.  However, should the Court look to the law of Delaware for the remainder of its preliminary injunction analysis, the outcome would be the same.  *See infra.*

"[T]he Fourth Circuit has repeatedly recognized that 'the threat of a permanent loss of customers and the potential loss of goodwill also support a finding of irreparable harm.'" *Update, Inc. v. Samilow*, 311 F. Supp. 3d 784, 796 (E.D. Va. 2018) (quoting *Multi-Channel TV Cable Co.*, 22 F.3d at 552); *accord Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*, 756 F.2d 1048, 1055 (4th Cir. 1985) (upholding preliminary injunction when plaintiff "faced irreparable, noncompensable harm in the loss of its customers"). This is because, unlike a "single transaction," the loss of customers and future work from diverted clients are difficult to quantify. *See Samilow*, 311 F. Supp. 3d at 796.

Additionally, both Virginia and Delaware courts have found imminent irreparable harm where defendants continued to possess plaintiffs' trade secrets and plaintiffs have lost the confidentiality of those client records and account information. *E.g.*, *Coreth*, 535 F. Supp. 3d at 517; *Eastman Kodak Co. v. Cetus Corp.*, 1991 WL 255936, at *6 (Del. Ch. Dec. 3, 1991) ("[T]he disclosure of trade secrets and other confidential information will, in appropriate cases, support a finding of irreparable harm."). Irreparable harm also exists where, as here, defendant resigns and improperly takes confidential client information with him, solicits those clients in breach of an employment agreement, causing "potential … lost business, lost goodwill, and lost trust." *E.g.*, *Fid. Glob. Brokerage Grp., Inc. v. Gray*, 2010 WL 4646039, at *3 (E.D. Va. Nov. 9, 2010) ("The likelihood of irreparable harm in customer solicitation cases such as this one is obvious. . . . Also difficult to quantify is the loss of customers' trust in the security of [plaintiff] as a custodian of their private information."); *see also Mountain W. Series of Lockton Cos., LLC v. Alliant Ins. Servs., Inc.*, 2019 WL 2536104, at *20 (Del. Ch. June 20, 2019).

Here, Christopher's actions in surreptitiously taking THG-NE's confidential information for the clear purpose of destroying THG-NE's customer relationships show that he intends to use

THG-NE's trade secrets against it. *See Coreth*, 535 F. Supp. 3d at 516-17. Christopher systematically gathered all the information he would need to hand those relationships to a competitor: client policy information; renewal information and offers; prices and renewal pricing offers from carriers; and even spreadsheets listing clients' individual employees' benefits elections. (VC ¶¶ 62-67.) Christopher continues to have access to that information, and has refused, despite repeated demands, to return it or to identify the third parties with whom he has shared it. (VC ¶¶ 77-85.) In fact, Christopher continues to pretend he is not breaching his non-solicit obligations at all, despite his concerted theft of confidential information and clients. Moreover, at least one THG-NE customer who has received Precision's solicitations (which are directed or facilitated by Christopher) has already expressed concern to THG-NE about Precision's disparagement of THG-NE's fitness to do business. (VC ¶¶ 84-92 and Ex. H.); *see also Coreth*, 535 F. Supp. 3d at 516-17 (loss of confidence and trust of customers and harm to business reputation constitute irreparable harm). Christopher's continued deceptiveness confirms his intent to continue ignoring his contractual obligations and to use THG-NE's confidential information and trade secrets in the process.

Not only could Christopher's misappropriation result in additional clients transferring their existing policies—even beyond what has already occurred on an alarming scale—but such misappropriation would permit a competitor to gain additional business from those clients; undermine THG-NE's relationships with insurance carriers; underbid THG-NE's pricing; and diminish THG-NE's standing in the marketplace. Furthermore, it is impossible to calculate the damages to THG-NE with any degree of certainty even as to the clients that have already transferred policies, both because of the renewal business THG-NE has lost and because an insurance brokerage often grows its business through client referrals. *See Samilow*, 311 F. Supp.

3d at 796 ("In this case, plaintiff is harmed not only by the loss of particular deals or particular work from clients, but plaintiff also risks losing future business opportunities with the clients defendant has diverted."); *see also Hilb Grp. of Maryland, LLC v. Smith*, 2024 WL 2216851, at *4 (M.D. Pa. May 15, 2024) (finding irreparable harm on similar facts because the "business of an insurance broker relies on repeat and referral business streams which are not so easily quantified"); *In re Digex, Inc. S'holders Litig.*, 789 A.2d 1176, 1215 (Del. Ch. 2000) (finding that the danger of losing valuable revenue-generating relationships is a harm that may not be compensable in any manner other than injunctive relief). As such, "plaintiff has sufficiently shown a risk of irreparable harm." *Samilow*, 311 F. Supp. 3d at 796.

Further still—and dispositively—Christopher has contractually agreed that that "actual or threatened breach" of the RCA "shall result in irreparable harm, for which the Company or THG will not have an adequate remedy at law." (RCA ¶ 10.) As the Supreme Court of Virginia has held, it is "well-settled that parties to a contract may specify the events or pre-conditions that will trigger a party's right to recover for the other party's breach of their agreement." *Ulloa v. QSP, Inc.*, 624 S.E.2d 43, 48 (Va. 2006). And as here, "[u]nder Virginia law, such provisions in restrictive covenants are enforceable and can satisfy the irreparable harm element." *Noble Supply & Logistics, LLC v. Curry*, 2023 WL 8481021, at *8 (W.D. Va. Dec. 7, 2023); *see also O'Sullivan Films, Inc. v. Neaves*, 352 F. Supp. 3d 617, 628 (W.D. Va. 2018) (accord); *TP Group-CI, Inc. v. Vetecnick*, 2016 WL 5864030, at *2 (D. Del. Oct. 6, 2016) (accord). For all of these reasons, irreparable harm has already begun and will continue, absent injunctive relief.

## IV.    The Balance Of Equities Weighs In THG-NE's Favor

Given Christopher's wholesale theft of information and customer relationships, directly and through Precision, the balance of equities weighs heavily in THG-NE's favor. As discussed above, unless the Court enjoins Christopher from using THG-NE's trade secrets, THG-NE will

continue to suffer irreparable harm. In such circumstances, Virginia courts routinely hold that "balancing of the equities strongly favors granting an injunction to foreclose a party from benefitting from its misappropriation of another's trade secrets." *Coreth*, 535 F. Supp. 3d at 518 (cleaned up). Moreover, without an injunction, THG-NE will continue to suffer irreparable damage to its goodwill, trust, and customer relationships. *E.g.*, *Coreth*, 535 F. Supp. 3d at 519 (finding that balance of equities favored employer where the employer had already lost numerous customers); *Vetecnik*, 2016 WL 5864030, at *2 (same).

On the other hand, Christopher has brought any harm he would suffer from a preliminary injunction, if any, upon himself. *See Coreth*, 535 F. Supp. 3d at 518 ("Although an injunction may somewhat impair the [defendants'] ability to earn a living, that consequence was reasonably foreseeable" based upon their awareness of their restrictive covenants they chose to violate.); *Gray*, 2010 WL 4646039, at *4 ("Simply put, if it is true that Gray is contractually barred from using customer information he learned at Fidelity in his current position, then Gray loses nothing by an injunction prohibiting him from doing so."); *Hough Assocs., Inc. v. Hill*, 2007 WL 148751, at *19 (Del. Ch. Jan. 17, 2007) (accord). Christopher knew about the RCA's restrictive covenants but still chose to disregard them, to steal confidential information from THG-NE, to solicit customers to his competing brokerage using that information in violation of the RCA, and to defiantly refuse to cooperate when THG-NE demanded his compliance. Christopher's cavalier approach to THG-NE's restrictive covenants is the reason he finds himself in this situation. Plus, an injunction will not prevent or even hinder Christopher from earning a living, as Christopher agreed in the RCA.[6] Enforcing Christopher's RCA will prohibit him from competing with THG-NE only as to those

---

[6] "Employee acknowledges that the restrictions stated herein are reasonable . . . and do not unduly impede or interfere with Employee's ability to earn a livelihood." (RCA ¶ 7.)

18

customers and prospects with whom he worked on THG-NE's behalf. The balance of equities favors THG-NE in these circumstances. *Samilow,* 311 F. Supp. 3d at 796; *see also TechINT Sols. Grp., LLC v. Sassnett*, 2018 WL 4655752, at *7 (W.D. Va. Sept. 27, 2018) (balance of equities weighed in favor of enforcement where the defendant was prohibited only "from providing competing services to or soliciting [the plaintiff's] clients . . ."); *Vetecnik*, 2016 WL 5864030, at *2 ("Enforcing the agreement is unlikely to cause irreparable harm to Defendant as he will not be enjoined for finding suitable employment"). As such, this factor supports injunctive relief.

## V.     Injunctive Relief Serves The Public Interest

Courts within the Fourth Circuit recognize that the public interest favors the enforcement of reasonable, mutually agreed-upon restrictive covenants and fair competition in the marketplace. *E.g., Neaves*, 352 F. Supp. 3d at 628 ("Virginia law certainly encourages the enforcement of valid non-compete agreements[.]") (cleaned up); *A.P. Moller-Maersk A/S v. Escrub Sys., Inc.*, 2007 WL 4562827, at *4 (E.D. Va. Dec. 21, 2007) ("Failure to grant a TRO and thereby inhibit further contract breach is harmful to the public's ability to rely on contract agreements."); *JTH Tax, Inc. v. Olivo*, 2016 WL 595297, at *5 (E.D. Va. Feb. 12, 2016) ("Enforcement of a valid non-compete clause aids public interest by preventing customer confusion and requiring parties to value the sanctity of contract.") (internal quotations omitted); *Samilow,* 311 F. Supp. 3d at 796 ("To be sure, contracts in restraint of trade are generally disfavored under Virginia law as a matter of public policy. But, Virginia law does encourage the enforcement of *valid* non-compete agreements, such as the one at issue here.") (emphasis in original; internal citation omitted). And "[t]here is no doubt that it is in the public interest to protect trade secrets[.]" *API Tech. Servs., LLC v. Francis*, 2013 WL 12131381, at *3 (E.D. Va. Dec. 4, 2013); *see also Coreth*, 535 F. Supp. 3d at 519; *Vetecnik*, 2016 WL 5864030, at *3 ("[P]rotecting Plaintiff's confidential information outweighs the temporary restrictions on Defendant's employment options.").

THG-NE invested significant time, money, and effort into helping Christopher learn and succeed in the insurance industry. By granting the requested relief, "[t]he public interest cannot be said to suffer in any way" and, in fact, it favors protecting THG-NE's investment. *Nat'l Homes Corp. v. Lester Indus., Inc.*, 293 F. Supp. 1025, 1032 (W.D. Va. 1968), *aff'd in part, rev'd in part*, 404 F.2d 225 (4th Cir. 1968) ("No monopoly has been established. No shortage of the employee's type of services will be brought about by enjoining the defendant."). Additionally, an injunction cannot be said to interfere with the with "the broker-client relationship" because "the requested relief does not prevent clients from transferring accounts on their own accord and based on an informed choice. Rather, it prevents [Christopher] from violating valid [restrictive covenant] agreements with [his] employer[] and misappropriating trade secrets for personal gain." *Coreth*, 535 F. Supp. 3d at 519 (E.D. Va. 2021). Accordingly, THG-NE has satisfied the fourth and final requirement for a preliminary injunction. *Centennial Broad, LLC v. Burns*, 2006 WL 2850640, at *11 (W.D. Va. Sept. 29, 2006), *aff'd*, 254 F. App'x 977 (4th Cir. 2007) ("The public interest is served by the legal system's swift and clear enforcement of a fair and freely made contract."); *see also Sensus USA, Inc. v. Franklin*, 2016 WL 1466488, at *8 (D. Del. Apr. 14, 2016) ("It is in the interest of the public to hold parties to the very terms upon which they negotiated and agreed to be bound.").

## **CONCLUSION**

For the reasons above, THG-NE respectfully requests that the Court enter a temporary restraining order or, alternatively, a preliminary injunction requiring Christopher to honor his contractual promises, on the terms set forth in THG-NE's accompanying motion.

This the 21st day of June, 2024.

*/s/ Heidi E. Siegmund*

Heidi E. Siegmund (VBN 89569)
hsiegmund@mcguirewoods.com
Christopher M. Michalik (VBN 47817)
cmichalik@mcguirewoods.com
Daniel P. Peyton (VBN 97161)
dppeyton@mcguirewoods.com
**McGuireWoods LLP**
800 East Canal Street
Richmond, VA 23219
P: (804) 775-1000
F: (804) 775-1061

*Counsel for Plaintiff*