## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

THE HILB GROUP OF NEW          )
ENGLAND, LLC,                  )
                               )
            Plaintiff,         )
                               )
v.                             )          Civil Action No. 3:24-cv-462–HEH
                               )
CHRISTOPHER LAVORGNA, *et al.*, )
                               )
            Defendants.        )

### <u>MEMORANDUM OPINION</u>
### (Granting Plaintiff's Motion for Temporary Restraining Order)

THIS MATTER is before the Court on Plaintiff The Hilb Group of New England, LLC's ("Plaintiff") Motion for a Temporary Restraining Order or, in the Alternative a Preliminary Injunction (the "Motion for Temporary Restraining Order," ECF No. 6), filed on June 21, 2024. Plaintiff seeks a temporary restraining order ("TRO") against Defendant Christopher LaVorgna ("Christopher"), pursuant to Federal Rule of Civil Procedure 65. (Mot. at 1.) The Court heard oral argument on June 27, 2024. At the hearing, the Court granted Plaintiff's Motion for Temporary Restraining Order for the reasons articulated below. (Minute Entry at 1, ECF No. 16.)

### I. BACKGROUND

Plaintiff filed its Complaint (ECF No. 1) asserting twelve (12) counts against Defendants Christopher, Eric LaVorgna ("Eric"), and Precision Insurance LLC ("Precision") (collectively, "Defendants"), on June 21, 2024. Plaintiff is a commercial and personal insurance brokerage and administrator. (Compl. ¶ 20.) In May 2021,

Plaintiff acquired Andrews Benefits, where Christopher and Eric worked as insurance brokers, primarily in the employee benefits sector. (*Id.* ¶¶ 27–28.) Christopher and Eric served in client-facing roles, which provided them access to highly sensitive business information. (*Id.* ¶¶ 28–30.) Once the acquisition was complete, Christopher and Eric began working for Plaintiff and executed an employment agreement with Plaintiff which included restrictive covenants. (*Id.* ¶¶ 31–32.) Eric worked for Plaintiff until July 7, 2021, while Christopher worked for Plaintiff until April 30, 2024. (*Id.* ¶¶ 35–36.)

As a highly competitive insurance brokerage firm, Plaintiff maintains confidential and trade secret information, including, but not limited to: "customer contact lists; client detail reports containing detailed information about the key-decision makers, revenues, and commissions; customer leads and prospects; customer history and analyses; marketing plans; client employee benefit elections; pricing information; policy information; and similar information about [Plaintiff]'s business and its customers' insurance policies and needs." (*Id.* ¶¶ 37–40.) Plaintiff protects this information on password-protected computer systems and limits access on a need-to-know basis. (*Id.* ¶¶ 41–42.) Plaintiff also protects its sensitive business information by requiring its employees, including Christopher and Eric, to sign confidentiality and restrictive covenant agreements. (*Id.* ¶¶ 31–32, 42–43.)

The confidentiality provision prohibits Christopher from "us[ing] any Confidential Information other than in connection with Employee's employment with [Plaintiff] or disclosing any Confidential Information to any person or entity other than [Plaintiff and

its affiliates], unless and until such Confidential Information has become public knowledge without fault by Employee." (Ex. A at 8, ECF No. 1-1.) Christopher's restrictive covenant agreement bars him from copying, removing, or retaining "any written, electronic or other tangible material containing Confidential Information" from Plaintiff's premises without prior written consent. (Ex. A at 9.) Christopher agreed to return all Plaintiff's property upon the cessation of his employment, including "any [] material containing or disclosing any Confidential Information." (*Id.*) The agreement also included a non-solicitation provision which states, in relevant part:

> To protect the value of [Plaintiff's and its affiliates'] business and goodwill, Employee agrees that, except in the regular course of employment by [Plaintiff] or as [Plaintiff or its affiliates] may expressly authorize or direct in writing, during Employee's employment with [Plaintiff] and for a period of two (2) years immediately following the termination of Employee's employment for any reason, Employee shall not:
>
> A. (i) Have contact with, (ii) solicit, or (iii) direct or assist in the contact with or the solicitation of any of [Plaintiff]'s Customers (as defined below)[1] for the purpose of selling or providing any Competitive Products or Services (as

---

[1] The agreement defines "Customer" to mean:

> as of the date of termination of Employee's employment (or, if such is deemed by a court of competent jurisdiction as overly broad, as of the date of any activity prohibited in Section 3(A)-(C) above), any individual or entity that is a customer of [Plaintiff] with whom Employee (i) had direct business contact or communications within the immediately preceding twenty-four (24) month period as a result of Employee's employment with [Plaintiff]; or (ii) for whom Employee had direct supervisory, sales, or service responsibility within the immediately preceding twenty-four (24) month period as a result of Employee's employment with [Plaintiff]; or (iii) about whom Employee possessed Confidential Information or Third Party Information (including, but not limited to, risk management characteristics) as a result of Employee's employment with [Plaintiff].

(Ex. A at 10.)

defined below)[2];

B. Provide Competitive Products or Services to any Customer for or on behalf of any person or entity other than [Plaintiff]; or

C. Induce or attempt to induce any of [Plaintiff]'s Customers to cease doing business in whole or in part with [Plaintiff].

(*Id.* at 10–11.) Christopher's contract is governed by Delaware law. (*Id.* at 14.)

Eric's agreement prohibits him from "disclos[ing] any Confidential Information to any person or entity other than [Plaintiff and its affiliates], unless and until such Confidential Information has become public knowledge without fault by Employee," during and after his employment with Plaintiff. (Ex. B at 2, ECF No. 1-2.) Like in Christopher's agreement, Eric's agreement prevents him from copying, removing, or retaining Plaintiff's confidential information, and mandates the return of all "material containing or disclosing any Confidential Information" upon the cessation of his employment. (*Id.* at 3.) Eric's contract is governed by Massachusetts law. (*Id.* at 1.)

Plaintiff alleges that, without authorization, Christopher collected and sent the following information to his personal email address during his final year of employment:

- Customer policies, renewals, and amendments;
- [Plaintiff's] proposals for upcoming renewals and alternate options, including detailed rate grids, pricing, and cost analysis broken down by customers' enrolled employees;
- Benefits summaries, reflecting the benefits various customers had purchased;
- Detailed benefits pricing information (including both current and anticipated renewal rates) for various health plan offerings and other employee benefits purchased by [Plaintiff's] customers;

---

2 The agreement defines "Competitive Products or Services" as "any services or products competitive with any product or service sold, offered for sale, or under development by [Plaintiff] as of the date of Employee's termination of employment." (Ex. A at 10.)

- Spreadsheets detailing customers' employee benefit elections; and
- Spreadsheets detailing customers' plan funding and settlement of claims.

(Compl. ¶¶ 63–64.) Plaintiff believes Christopher took this information with the intent to use it to steal Plaintiff's clients. (*Id.* ¶¶ 65–67.) Plaintiff also believes that, during this time, Christopher was conspiring with Eric to start a competing business, Precision. (*Id.* ¶ 68.) Eric formed Precision on March 14, 2024. (*Id.* ¶ 69.) Christopher resigned from Plaintiff on April 30, 2024, and joined Precision as its Senior Benefits Consultant. (*Id.* ¶¶ 70, 73.)

Christopher and Eric then began soliciting Plaintiff's clients that Christopher formerly serviced. (*Id.* ¶ 75.) By June 3, 2024, eight (8) of Plaintiff's customers had moved their business to Precision.[3] (*Id.* ¶ 76.) Many of Plaintiff's other customers have also filed to change their broker of record status. (*Id.*)

On May 15, 2024, Plaintiff sent cease-and-desist letters to Defendants demanding compliance with their contractual obligations. (*Id.* ¶¶ 77–78.) Defendants did not respond. (*Id.* ¶ 79.) After sending the first set of cease-and-desist letters, Plaintiff discovered that Christopher sent confidential documents and information to his personal email address. (*Id.* ¶¶ 80–81.) Plaintiff then sent each Defendant a second cease-and-desist letter on June 3, 2024. (*Id.* ¶ 82.) On June 6, 2024, Christopher responded that he had not violated any of his contractual agreements and requested a list of the allegedly solicited customers along with affidavits signed by each of the solicited clients. (*Id.* ¶ 83;

---

[3] At the hearing on June 27, 2024, Plaintiff indicated that at least nine (9) of its customers have now moved their business to Precision.

Ex. G at 2, ECF No. 1-7.) Eric and Precision did not respond to the second cease-and-desist letters. (*Id.* ¶ 85.) Just days after receiving the second cease-and-desist letters, Eric emailed one of Plaintiff's customers expressing concern over Plaintiff's ability to service the client and offering Precision's services to the customer. (*Id.* ¶¶ 87, 91.) This string of events led Plaintiff to file this lawsuit and seek a TRO against Christopher.

## II. LEGAL STANDARD

A TRO is designed to "preserv[e] the status quo and prevent[] irreparable harm just so long as is necessary to hold a hearing, and no longer." *Granny Goose Foods, Inc. v. Brotherhood of Teamsters and Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*, 415 U.S. 423, 439 (1974). A TRO may be issued with or without notice to the adverse party. FED. R. CIV. P. 65(b). The Court may only issue a TRO if the movant establishes "[(1)] that [it] is likely to succeed on the merits, [(2)] that [it] is likely to suffer irreparable harm in the absence of preliminary relief, [(3)] that the balance of equities tips in [its] favor, and [(4)] that [injunctive relief] is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The movant bears the burden of proving it is entitled to injunctive relief. *Granny Goose Foods*, 415 U.S. at 443. A TRO may last up to fourteen (14) days, unless the Court extends that time for good cause or the adverse party consents to a longer extension. FED. R. CIV. P. 65(b)(2). To issue a TRO, the movant must provide security in an amount determined by the Court. *Id.* at 65(c).

6

## III. DISCUSSION

### A. Plaintiff is likely to succeed on the merits.

Plaintiff is likely to succeed on the merits of Counts I, III, and IV. Due to the expedited nature of a TRO and the injunctive relief sought, the Court will limit its consideration of the merits to these three (3) counts against Christopher.

#### 1. Count I: Breach of Contract

Under Delaware law,[4] to establish a breach of contract claim, a plaintiff must show: "(1) the existence of a contract, express or implied; (2) breach of an obligation imposed by the contract; and (3) damages." *Williams v. Progressive Direct Ins. Co.*, 631 F. Supp. 3d 202, 213 (D. Del. 2022) (footnote omitted).

The elements of Plaintiff's breach of contract claim against Christopher are likely met. Plaintiff has produced a signed copy of Christopher's Producer Employment Agreement, which includes a Restrictive Covenant Agreement attached as Schedule B. (*See* Ex. A.) This agreement prohibits Christopher from using or disclosing any of Plaintiff's confidential information or retaining this information beyond his employment. It also contains a non-solicitation provision which bars Christopher from contacting, soliciting, or assisting in the contact or solicitation of Plaintiff's customers for two (2) years following the end of his employment. Plaintiff has produced sufficient evidence to show that Christopher has likely violated the confidentiality provision of his employment

---

[4] The Court applies Delaware law pursuant to the choice of law provision contained in Christopher's employment agreement. (Ex. A at 14); *see Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007) ("Virginia law looks favorably upon choice of law clauses in a contract, giving them full effect except in unusual circumstances. . . .").

agreement by sending confidential information to his personal email. (*See* Ex. C, ECF No. 1-3; Ex. D, ECF No. 1-4; Ex. E, ECF No. 1-5.) Additionally, Plaintiff has provided evidence that Christopher has aided Eric in contacting and servicing Plaintiff's clients in violation of the non-solicitation provision. (*See* Exs. H, ECF No. 1-8; Ex. I, ECF No. 1-9.) Plaintiff has also shown that Christopher's breaches have resulted in damages, including the loss of at least nine (9) clients thus far.

The non-solicitation provision is also likely enforceable under Delaware law. Non-solicitation agreements will be enforced so long as they are "(i) reasonable in geographic scope and temporal duration, (ii) advance legitimate economic interests of the party seeking enforcement, and (iii) survive a balancing of the equities." *Cantor Fitzgerald, L.P. v. Ainslie*, 312 A.3d 674, 684 n.65 (Del. 2024).

Christopher's non-solicitation agreement prohibits him from interfering with Plaintiff's customers and is limited to two (2) years. Thus, it is likely reasonable in geographic scope and temporal duration. *See Singh v. Batta Env't Assocs., Inc.*, No. Civ.A. 19627, 2003 WL 21309115, at *7 (Del. Ch. May 21, 2003) (finding a two-year non-solicitation provision reasonable); *Tristate Courier and Carriage, Inc. v. Berryman*, No. C.A. 20574-NC, 2004 WL 835886, at *11 (Del. Ch. Apr. 15, 2004) (finding a two-year non-solicitation agreement prohibiting the defendants from soliciting or assisting in the solicitation of the former employer's clients reasonable in time and scope). The non-solicitation provision likely advances Plaintiff's economic interests in maintaining its goodwill and business reputation and protecting its customer base in a highly competitive

8

industry. *See Research & Trading Corp. v. Pfuhl*, No. 12527, 1992 WL 345465, at \*12

("[A]n employer has an interest in the goodwill created by its sales representatives and

other employees, which is vulnerable to misappropriation if the employer's former

employees are allowed to solicit its customers shortly after changing jobs."). Finally, the

non-solicitation agreement likely survives a balancing of the equities between "the

interests sought to be protected by [P]laintiff [] against the injury that injunctive relief

would cause to [Christopher]." *Id.* at \*13. The interest in protecting consumer

relationships is "weighty and worthy of the court's protection." *Id.* Additionally,

Plaintiff is not attempting to prevent Christopher from working in the insurance industry;

rather, it is attempting to enforce his contractual obligations to protect its goodwill and

customer base. *See id.* Thus, the non-solicitation agreement is likely enforceable.[5]

### 2. Counts III and IV: Misappropriation of Trade Secrets under the Defend Trade Secrets Act and Delaware Uniform Trade Secrets Act

To establish a misappropriation of trade secrets claim under the Defendant Trade

Secrets Act ("DTSA"), a plaintiff must show (1) the information constitutes a trade

secret, and (2) the defendant misappropriated the trade secret by improper means or

conspired to use improper means to misappropriate the trade secret. 18 U.S.C. § 1836

(b)(2)(A)(ii)(IV). The DTSA defines "trade secret" as all forms and types of financial,

business, scientific, technical, economic, or engineering information" where (1) "the

---

[5] The Court notes that, by signing his employment agreement, Christopher acknowledged that the non-solicitation restriction is "reasonable and necessary to protect the legitimate business interests" of Plaintiff "and do[es] not unduly impede or interfere with [Christopher's] ability to earn a livelihood." (Ex. A at 12.)

owner thereof has taken reasonable measures to keep such information secret; and [(2)] the information derives independent economic value . . . from not being generally known [] and not being readily ascertainable through proper means." *Id.* § 1839(3). A defendant misappropriates a trade secret if he acquires a trade secret by improper means or discloses or uses a trade secret without consent. *Id.* § 1839(5). "'[I]mproper means' include[] theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *Id.* § 1839(6).

Under the Delaware Uniform Trade Secrets Act ("DUTSA"), a plaintiff must show that the defendant misappropriated its trade secrets through improper means. DEL. CODE ANN. 6 § 2001, *et seq.* The DUTSA's definitions of trade secrets, misappropriation, and improper means are nearly identical to those definitions in the DTSA. *See id.* § 2001(1)–(2), (4). Because the DTSA and DUTSA are substantially similar, the Court addresses Plaintiff's success on the merits of these claims together.

Plaintiff has shown that Christopher likely took its trade secrets. First, the documents Christopher sent to his personal email address included customer proposals, policies, renewals, and amendments; customer benefit summaries; pricing information; customer benefit elections; and customers' plan funding and settlement of claims. (*See* Exs. C, D, E.) This information constitutes trade secrets as defined in the DTSA and DUTSA. Second, Plaintiff has shown that it took reasonable measures to keep this information secret by requiring Christopher, and all of its employees, to sign confidentiality agreements. Additionally, Plaintiff password protects its computer

systems and limits its confidential information on a need-to-know basis. Third, the

information taken by Christopher derives independent economic value from its secrecy

because it details Plaintiff's insurance operations, business dealings, and customer

records. Thus, the Court turns to whether Christopher misappropriated Plaintiff's trade

secrets by improper means.

Plaintiff has provided evidence that Christopher acquired its trade secrets by

improper means and used its trade secrets without consent. Christopher obtained the

information by emailing it to his personal email account in violation of his employment

agreement. Additionally, since Christopher's departure from Plaintiff, some of Plaintiff's

customers have joined his new insurance firm, Precision. This is indicative of improper,

unauthorized use of Plaintiff's trade secrets. Thus, Plaintiff has shown that Christopher

likely misappropriated its trade secrets under the DTSA and DUTSA. *See Great Am.*

*Opportunities, Inc. v. Cherrydale Fundraising, LLC*, No. Civ.A 3718-VCP, 2010 WL

338219, at *19 (Del. Ch. Jan. 29, 2010) (holding that retention and use of customer lists

by former employees after they began working for a competitor constitutes a

misappropriation of trade secrets); *Nucar Consulting, Inc. v. Doyle*, No. Civ.A 19756-

NC, 2005 WL 820706, at *10–11 (Del. Ch. Apr. 5, 2005), *aff'd*, 913 A.2d 569 (Del.

2006) (finding misappropriation because former employees retained a customer list

beyond their employment and the plaintiff showed they used this list to take business to a

competitor).

**B. Plaintiff is likely to suffer irreparable harm.**

The Court next analyzes whether Plaintiff is likely to suffer irreparable harm absent injunctive relief. To establish irreparable harm, the plaintiff "must make a clear showing that it will suffer harm that is neither remote nor speculative, but actual and imminent." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (internal quotations and citation omitted). "[T]he harm must be irreparable, meaning that it cannot be fully rectified by the final judgment after trial." *Id.* (internal quotations and citation omitted).

Plaintiff has established that it will likely suffer irreparable harm. The Fourth Circuit has held that the loss of goodwill in the plaintiff's industry, loss of customers, and loss of the ability to attract new customers may entitle the plaintiff to injunctive relief. *See Signature Flight Supp. Corp. v. Landow Aviation Ltd. P'ship*, 442 F. App'x 776, 785 (4th Cir. 2011). "[C]ourts frequently grant injunctions when there is a substantial risk that the defendant[] will continue to divulge or misappropriate trade secrets in the absence of court action." *ClearOne Advantage, LLC v. Kersen*, No. JKB-23-03446, 2024 WL 69918, at *7 (D. Md. Jan. 5, 2024) (citation omitted). Here, Plaintiff has shown that it has lost at least nine (9) customers. Plaintiff has asserted a loss of goodwill and business reputation in the insurance industry. It has also provided evidence that Christopher used confidential information, trade secret information, and client information without authorization and this use was not curtailed by two (2) sets of cease-and-desist letters. Thus, Plaintiff will likely suffer irreparable harm absent the issuance

of a TRO.

### C. The balance of equities tips in favor of Plaintiff.

Next, the Court must "balance the likelihood of harm to the plaintiff against the likelihood of harm to the defendant." *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 271 (4th Cir. 2002). The balance of the equities and hardship to the parties tips heavily in favor of injunctive relief. As previously discussed, Plaintiff is likely to prevail on its breach of contract and misappropriation of trade secret claims, and is currently suffering, and will continue to suffer, irreparable harm. Thus, there is substantial harm to Plaintiff.

On the other hand, Christopher faces minimal harm from the Court merely enforcing restrictive covenants that Christopher agreed to when signing his employment agreement. *See Variable Annuity Life Ins. Co. v. Coreth*, 535 F. Supp. 3d 488, 518 (E.D. Va. 2021) (holding that, although injunctive relief may impair the defendants' ability to earn a living, "that consequence was reasonably foreseeable" because the defendants violated their restrictive covenants); *Fidelity Glob. Brokerage Grp., Inc. v. Gray*, No. 1:10-cv-1255, 2010 WL 4646039, at *4 (E.D. Va. Nov. 9, 2010) ("Simply put, if it is true that [the defendant] is contractually barred from using customer information he learned [during his employment with Plaintiff] in his current position, then [the defendant] loses nothing by an injunction prohibiting him from doing so."); *see also Evapco, Inc. v. Mech. Prod. Sw., LLC*, No. SAG-22-3375, 2023 WL 361131, at *4 (D. Md. Jan. 23, 2023) (finding that the hardship to defendant if the court granted injunctive relief "seems relatively minor, given that the 'relief' that [the plaintiff] seeks is merely the enforcement

13

of the parties' non-compete clause"). Moreover, a TRO is a temporary measure, and Christopher will have the opportunity to oppose any future injunctive relief at the preliminary injunction hearing. Thus, the balance of equities strongly favors the issuance of a TRO.

### D. A TRO is in the public interest.

The public interest favors the enforcement of valid restrictive covenants and the protection of confidential business information. *See ABT, Inc. v. Juszczyk*, No. 5:09-cv-119, 2010 WL 3156542, at *9 (W.D.N.C. Aug. 10, 2010); *Moller-Maersk A/S v. Escrub Sys., Inc.*, No. 1:07-cv-1276, 2007 WL 4562827, at *4 (E.D. Va. Dec. 21, 2007) ("Failure to grant a TRO and thereby inhibit further contract breach is harmful to the public's ability to rely on contract agreements"). The public will not suffer by the mere enforcement of a reasonable, valid employment contract between the parties. Additionally, issuing a TRO in this case supports the public interest of safeguarding confidential information. Thus, the public interest favors the issuance of a TRO.

### IV. CONCLUSION

For the foregoing reasons, the Court will grant Plaintiff's Motion for Temporary Restraining Order. An appropriate Temporary Restraining Order will accompany this Memorandum Opinion.

/s/

Henry E. Hudson
Senior United States District Judge

Date: June 28, 2024
Richmond, Virginia

14